# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MEGHAN GROLLEY, | No. 59832-9-II |
| Respondent/Cross Appellant, | (consolidated with Nos. 59839-6-II, 59842-6-II, 59849-3-II, 59852-3-II, and 59859-1-II) |
| v. | |
| AUTUMN LIVERMORE, | UNPUBLISHED OPINION |
| Appellant/Cross Respondent. | |

MEGHAN GROLLEY,

　　　　　Respondent/Cross Appellant,

v.

GLEN LIVERMORE,

　　　　　Appellant/Cross Respondent.

EVAN GROLLEY,

　　　　　Respondent/Cross Appellant,

v.

GLEN LIVERMORE,

　　　　　Appellant/Cross Respondent.

EVAN GROLLEY,

　　　　　Respondent/Cross Appellant,

v.

AUTUMN LIVERMORE,

No. 59832-9-II (consol. w/Nos. 59839-6-II, 59842-6-II, 59849-3-II, 59852-3-II, and 59859-1)

|  |  |
|---|---|
| Appellant/Cross Respondent. | |
| KEEGAN GROLLEY, | |
| Respondent/Cross Appellant, | |
| v. | |
| GLEN LIVERMORE, | |
| Appellant/Cross Respondent. | |
| KEEGAN GROLLEY, | |
| Respondent/Cross Appellant, | |
| v. | |
| AUTUMN LIVERMORE, | |
| Appellant/Cross Respondent. | |

CRUSER, J.—Glen and Autumn Livermore appeal six anti-harassment protection orders restraining the Livermores and protecting Meghan, Evan, and Keegan Grolley. The Livermores assert that the trial court erred by issuing these protection orders as there was not enough evidence to find that Glen and Autumn each engaged in unlawful harassment. The Livermores also argue that the trial court relied on constitutionally protected activity when granting the protection orders. They ask us to reverse and remand for the trial court to reconsider the protection orders. The Grolleys argue that the trial court did not abuse its discretion in granting the orders, and they cross-appeal the trial court's failure to award them attorney fees. They contend this was an abuse of discretion. They ask us to vacate the trial court's decision regarding fees and remand for reconsideration.

No. 59832-9-II (consol. w/Nos. 59839-6-II, 59842-6-II, 59849-3-II, 59852-3-II, and 59859-1)

We hold that the trial court did not abuse its discretion by granting the protection orders or by withholding a fee award to the Grolleys. We therefore affirm. We grant fees on appeal to the Grolleys and sanction the Livermores for submitting a noncompliant brief.

FACTS

I. RELATIONSHIPS BETWEEN PARTIES

Meghan Grolley is married to Evan Grolley, and Keegan Grolley is Meghan's[1] biological son. Meghan and Glen Livermore used to be in a romantic relationship, and Glen is Keegan's biological father. In 2007, Meghan and Glen entered a parenting plan that limited Glen's contact with Keegan based on willful abandonment, abuse of a child, and domestic violence. According to Meghan, Glen had sexually assaulted Meghan and physically assaulted Keegan. After entry of the parenting plan, "Mr. Livermore inconsistently exercised supervised visits with Keegan over the next [seven] or so years." Sealed Clerk's Papers (SCP) (No. 59839-6-II) at 29. In 2017, Glen relinquished his parental rights and Evan adopted Keegan. Glen is now married to Autumn Livermore and has a daughter named Jordyn.

In June 2024, Meghan, Evan, and Keegan each sought anti-harassment protection orders against both Glen and Autumn Livermore.[2] The Grolleys explained the bases for the requested protection orders in their written declarations and at a superior court hearing.

---

[1] In the interests of clarity and consistency, we refer to the parties by their first names.

[2] Meghan sought a domestic violence protection order against Glen.

3

## II. BASES FOR PROTECTION ORDERS

The Grolleys offered the following information in support of their petitions. In 2020, Glen sent an email to Evan in which Glen asked how Keegan was doing and whether Glen could get in contact with Keegan before he turned 18. Evan did not reply to this email. Glen emailed Evan again in 2023, expressing his interest in contacting Keegan. Glen stated that he wanted to reach out Evan before "heading over [their] way." *Id.* at 58. Patrick Rawnsley, the Grolleys' attorney, replied to Glen on the Grolleys' behalf. Rawnsley stated that the Grolleys did not desire any contact from Glen and that further communication attempts "may be met with the filing of a Petition for an Antiharassment Protection Order." *Id.* at 61. Glen replied to Rawnsley in an email that read, "Guess what I will be seeing you face to face. Hold your breath;)." *Id.* at 60.

In June 2024, Evan returned home from an errand to find Autumn and Jordyn Livermore attaching signs to the gate on his property. The signs wished Keegan a happy graduation and included the contact information for " 'Jordyn Livermore' " and " 'dad.' " SCP (No. 59842-6-II) at 29. Jordyn told Evan that she was a friend of Keegan's from school; he did not believe her and asked her to leave. Autumn then "began getting aggressive and demanding that Keegan call her and tell her that [he] does not want to see her and their family." *Id.* Evan reported this incident to the sheriff's department. The same day, Keegan discovered Glen's business card inside of a package that he had ordered for himself.

The following day, Evan discovered signs posted along the road near his home that were addressed to Keegan, stating " 'we love you,' " " 'we miss you,' " and " 'call us,' " and listing phone numbers for " 'dad,' " " 'sister,' " and " 'step-mom.' " *Id.* at 30. One of Evan's neighbors told Evan that Jordyn came to her home asking for Keegan's contact information. Jordyn told

neighbors that she was Keegan's friend from school and left her own phone number when a neighbor would not disclose Keegan's phone number.

The following week, Keegan received a photo album in the mail. It contained pictures of Glen and his family, Keegan as a child, and photos of the signs that Autumn and Jordyn had posted on and near the Grolleys' property. One week later, an officer from the Kitsap County Sheriff's Office came to the Grolleys' home and stated that Jordyn Livermore had requested that they conduct a welfare check for Keegan, as he had not attended " 'his' graduation ceremony." SCP (59839-6-II) at 31. Keegan had graduated the previous year. The same day as the welfare check, Keegan received more photos from the Livermores of Keegan as a baby.

At the protection order hearing, Meghan, Evan, and Keegan each expressed that the Livermores' actions made them fearful for their family's safety. Meghan stated that after Autumn and Jordyn came to their home, she did not play with her children by the front gate anymore and did not walk through the neighborhood. She stated that the family considered moving out of the area, and that she was scared by the fact that the Livermores would not leave them alone "after they've been asked to multiple times." Verbatim Rep. of Proc. (VRP) at 25. Evan stated that he was concerned for his family's safety, and that it "exacerbated" his fears that he did not know where Glen was when Autumn and Jordyn came to the Grolleys' home. *Id.* at 11. Evan started checking the security cameras on the property more often and installed more cameras at his workplaces. Keegan considered moving away from home to protect his family. As a result of the Livermores' contact attempts, Keegan became more vigilant; he ensured that the blinds were closed and made notice of what vehicles were in the area.

Keegan wrote a message to Glen in his sworn declaration. Keegan stated that Glen's contact "is unwanted, unwarranted, and hopefully illegal for a very long time." SCP (No. 59859-1-II) at 25.

The Livermores testified at the hearing as well. Glen stated that he would have stopped emailing Evan if Evan had asked Glen to stop. Glen asserted that he did not know that Autumn and Jordyn had planned to post graduation signs on or around the Grolleys' property. He stated that he was not trying to threaten anyone, did not want to hurt anyone, and apologized. Autumn also apologized. She stated that Jordyn misses Keegan and that Autumn wanted to make sure Keegan was okay. She stated that she understood that Keegan spoke for himself regarding his desire not to be contacted.

III. THE TRIAL COURT'S ORDERS

The trial court granted all the anti-harassment protection orders against Glen and Autumn. The orders protecting Evan and Meghan also protect their minor children. All of the protection orders are in effect for life.

In its oral ruling, the trial court found that harassment had occurred. It stated the following:

> Here, the course of conduct served no lawful or legitimate purpose. The course of conduct must be one that would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial emotional stress to the petitioner. In this case, the Court finds that this course of conduct would cause a reasonable person to suffer substantial emotional distress, and in this case did.

VRP at 40. The Grolleys asked for attorney fees during their closing remarks. The trial court denied the Grolleys' request for attorney fees, instead "reserving" the issue of fees for consideration if Glen or Autumn were to violate the orders. *Id.* at 42-43.

6

No. 59832-9-II (consol. w/Nos. 59839-6-II, 59842-6-II, 59849-3-II, 59852-3-II, and 59859-1)

The Livermores appeal the protection orders. The Grolleys cross-appeal the trial court's denial of attorney fees.

ANALYSIS

The Livermores argue that the trial court abused its discretion by granting protection orders against them because there was not enough evidence that Autumn and Glen each carried out a course of conduct directed at Meghan, Evan, and Keegan under the statutory definition of unlawful harassment. The Livermores also argue that Autumn and Glen cannot be held responsible for each other's (or for Jordyn's) conduct, that the Livermores did not intend to harass the Grolleys, that the trial court should not have entered permanent protection orders, that the trial court used the incorrect standard for finding that the Livermores engaged in unlawful harassment, and that the trial court relied on constitutionally protected activity in granting the protection orders. The Grolleys argue that the trial court properly considered the full context of the relationship between the Grolleys and the Livermores, that Jordyn's actions should be considered by the trial court because Autumn and Glen "assisted and allowed" Jordyn to help them get in contact with Keegan, that members of the Grolley family should be protected when harassment is directed at the family, and that the trial court did not err in granting all of the requested protection orders, even if it viewed each order independently of the others. Br. of Resp't at 36. The Grolleys argue on cross-appeal that the trial court erred by denying their request for fees and reserving the issue for further consideration if Glen or Autumn were to violate the protection order(s).

For the reasons detailed below, we affirm the trial court's orders of protection and its decision regarding attorney fees.

7

No. 59832-9-II (consol. w/Nos. 59839-6-II, 59842-6-II, 59849-3-II, 59852-3-II, and 59859-1)

As an initial matter, we note that the trial court's findings of fact are sufficient for us to review whether it erred in finding that Autumn and Glen Livermore unlawfully harassed Meghan, Evan, and Keegan Grolley. The Livermores assert that the trial court's factual findings were insufficient to support a finding of harassment. The trial court's written findings of fact are limited, and its oral findings of fact and conclusions of law mirror the statutory language for issuance of a protection order based on unlawful harassment. However, we have held that a trial court is only required to explain the reasons for its decision when it refuses to issue a protection order, not when it grants one. *In re Domestic Violence Protection Order for Timaeus*, 34 Wn. App. 2d 670, 683, 574 P.3d 127 (2025); RCW 7.105.225(6).[3] Additionally, "findings of fact that parrot statutory requirements are not invalid if they are specific enough to permit meaningful appellate review." *In re Dependency of W.W.S.*, 14 Wn. App. 2d 342, 363, 469 P.3d 1190 (2020). As we conclude that the trial court's findings of fact enable us to engage in meaningful review of its orders, we continue with our analysis.

I. DETERMINATION OF UNLAWFUL HARASSMENT

*A. Legal Principles*

A trial court must grant an order of protection if it determines that the respondent subjected the petitioner to unlawful harassment. RCW 7.105.225(1)(f). "Unlawful harassment" may include

> [a] knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, harasses, or is detrimental to such person, and that serves no legitimate or lawful purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner.

---

[3] RCW 7.105.225 has been amended since the petitions for orders for protection were filed. Because this amendment does not affect our analysis, we cite to the current version. *See* LAWS OF 2024, ch. 298, § 12.

RCW 7.105.010(37)(a).[4] A "[c]ourse of conduct" is "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." RCW 7.105.010(7)(a). The conduct may take the form of an electronic communication. *Id.* When deciding whether a course of conduct has any legitimate or lawful purpose, trial courts weigh a series of statutory factors, including whether the respondent was the only party to initiate contact, whether any clear notice was given to the respondent that the petitioner does not want further contact, or if the respondent seems to be attempting to "alarm, annoy, or harass the petitioner." RCW 7.105.010(7)(b). If an intimate partner unlawfully harasses another intimate partner, a trial court may grant a domestic violence protection order. RCW 7.105.010(10)(a), .225(1)(A).

We review a trial court's issuance of an anti-harassment protection order for abuse of discretion. *Trummel v. Mitchell*, 156 Wn.2d 653, 669, 131 P.3d 305 (2006). We review a trial court's findings of fact for substantial evidence, and next conclude whether the findings support the trial court's conclusions of law. *Graser v. Olsen*, 28 Wn. App. 2d 933, 941, 542 P.3d 1013 (2023). " 'Substantial evidence' is evidence sufficient to persuade a fair-minded, rational person that the finding is true." *Id.* We defer to the trier of fact on the persuasiveness of the evidence, conflicting testimony, and witness credibility, *id.* at 941-42, viewing the evidence and all reasonable inferences "in the light most favorable to the prevailing party." *Garza v. Perry*, 25 Wn. App. 2d 433, 453, 523 P.3d 822 (2023).

If a petitioner asserts that a respondent has harassed a group of people of which the petitioner is a member, the trial court may use its broad discretion to consider actions against

---

[4] RCW 7.105.010 has been amended since the petitions for orders for protection were filed. Because this amendment does not affect our analysis, we cite to the current version. *See* LAWS OF 2024, ch. 298, § 9.

individual members of the group when determining whether a "course of conduct" exists, even if not all of the group's members are parties in the proceeding. *Trummel*, 156 Wn.2d at 664-65. The members of the group must all be victims of harassment; group members may demonstrate such a shared experience by filing declarations and attending hearings. *Id.*

Harassment may include directing third parties to employ an intimidating course of conduct. *State v. Becklin*, 163 Wn.2d 519, 527, 182 P.3d 944 (2008). A fact finder may determine that a third party engaged in harassing activity on behalf of another person, even if there is no direct evidence that one party influenced the other. *Id.* at 524, 527.

*B. Application*

The Livermores argue that the trial court cannot grant a protection order without engaging in an individualized assessment of whether each respondent harassed each petitioner. The Livermores assert that the court should not have "reviewed the cases [against Autumn and Glen] as a whole" and there is not enough evidence against Glen and Autumn individually to prove unlawful harassment. Br. of Appellant at 26. The Livermores also claim in their opening brief that their conduct was not "persistent or excessive" enough to constitute harassment. *Id.* at 25. We disagree.

The trial court did not abuse its discretion in finding that Autumn and Glen each unlawfully harassed Meghan, Evan, and Keegan, because the trial court may consider acts against family members when granting protection orders to members of the family. *Trummel*, 156 Wn.2d at 664-65. Meghan, Evan, and Keegan all received contact from Autumn and Glen, and it is evident that the Livermores' contacts with each of the Grolleys had the common purpose of obtaining communication from Keegan. The Grolleys' declarations and testimony indicate that their

experiences of the Livermores' actions were shared, as they are all members of the same family and live in the same house. The trial court was within its rights to determine that the Livermores' conduct did not have a "legitimate . . . purpose" when the Grolleys made it clear multiple times that they did not want any communication with the Livermores and the Livermores contacted them anyway. RCW 7.105.010(7)(b). Finally, the Grolleys each suffered emotional distress as a result of the Livermores' course of conduct. The trial court did not abuse its broad discretion in granting protection orders on these facts.

The Livermores also argue that there was no evidence that any member of the Livermore family directed another member of the family to harass either Meghan, Evan, or Keegan, and that the actions of one family member cannot be "imputed" onto others. Br. of Appellant at 19. For instance, Glen testified that he was unaware that his wife and daughter tried to contact Keegan until after the fact. The Livermores also assert that any action by Jordyn Livermore cannot form a basis for the protection orders, as the trial court's findings of fact do not mention Jordyn and "[s]uch a finding would be inconsistent with the law and the specific facts of this case." Reply Br. at 26.

The trial court was not required to record specific reasons for granting the protection orders,[5] but even if it based its decision in part on Jordyn's actions or the actions of the Livermores as a group, the trial court would not have abused its discretion. The factfinder (in this case, the trial court) did not need direct evidence of one party's influence over another to hold the former responsible for the latter's actions. And the trial court has broad discretion to issue a protection order—it may grant a protection order even if a party does not request one. *Hough v. Stockbridge*,

---

[5] *Timaeus*, 34 Wn. App. 2d at 683.

No. 59832-9-II (consol. w/Nos. 59839-6-II, 59842-6-II, 59849-3-II, 59852-3-II, and 59859-1)

150 Wn.2d 234, 236, 76 P.3d 216 (2003). Given that context, the trial court did not abuse its discretion by determining that Glen and Autumn both engaged in unlawful harassment after viewing the totality of the evidence. One year after the Grolleys' attorney told Glen that the Grolleys did not want any contact from the Livermores and that any further contact may lead them to petition for a protection order, Glen's business card appeared in a package for Keegan and Glen's wife and daughter posted signs at (and near) the Grolleys' home with Glen's and Autumn's phone numbers. Every contact by a member of the Livermore family to the Grolleys was about Keegan or an attempt to get in contact with Keegan. It is reasonable for the trial court to consider Glen's and Autumn's behavior together in granting the protection orders.

The Livermores also contend that Glen and Autumn did not intend to harass the Grolleys. They claim that Autumn's communications specifically were not meant to harass but were "positive messages of support and love" intended "merely to display her care for Keegan Grolley." Br. of Appellant at 29, 32. However, the definition of "[u]nlawful harassment" does not consider intent, and the trial court is not required to find that a respondent intended to harass a petitioner before granting a protection order—the court need only find that the respondent harassed the petitioner. RCW 7.105.010(37), .225(1)(f). As explained above, the trial court did not abuse its broad discretion by issuing anti-harassment protection orders against the Livermores.

The Livermores make two arguments for the first time in their reply brief. First, they argue that the trial court erred by entering permanent protection orders rather than protection orders that may expire. Second, they argue that the trial court used an incorrect standard to determine whether unlawful harassment had occurred. Generally, we do not consider issues raised for the first time in a reply brief. *In re Marriage of Sacco*, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990); *Bergerson v.*

12

No. 59832-9-II (consol. w/Nos. 59839-6-II, 59842-6-II, 59849-3-II, 59852-3-II, and 59859-1)

*Zurbano*, 6 Wn. App. 2d 912, 926-27, 432 P.3d 850 (2018). Although we may, in our discretion, construe this rule liberally and consider arguments raised for the first time in a reply,[6] we decline to do so here. The Livermores provide no explanation why these claims could not have been raised in their opening brief.[7, 8]

## II. CONSTITUTIONALLY PROTECTED ACTIVITY

*A. Legal Principles*

As previously stated, RCW 7.105.010(37)(a) defines "[u]nlawful harassment" as "[a] knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, harasses, or is detrimental to such person, and that serves no legitimate or lawful purpose." A trial court may not issue an anti-harassment protection order based on constitutionally protected activity. RCW 7.105.010(7)(a) (defining "[c]ourse of conduct" to exclude "constitutionally protected free speech").

RAP 2.5(a) authorizes this court to "refuse to review" any alleged error not raised in the trial court, unless the claimed error relates to a lack of trial court jurisdiction, the failure to establish facts upon which relief could be granted, or a manifest error affecting a constitutional right. To

---

[6] *Bergerson*, 6 Wn. App. 2d at 926.

[7] The Livermores also did not raise these issues in the trial court and offer no analysis under RAP 2.5(a) explaining why we should consider this issue for the first time on appeal.

[8] The Livermores also argue in their opening brief that the trial court used the "wrong legal standard" for determining whether to grant a domestic violence protection order (DVPO), but do not explain why. Br. of Appellant at 61. It appears that Glen is arguing that he never *directly contacted* Meghan. It is well established, however, that indirect contact can form the basis for finding of harassment. *See, e.g., Rodriguez v. Zavala*, 188 Wn.2d 586, 592, 398 P.3d 1071 (2017) (holding that a family member may request a DVPO based on their fear for another family member); RCW 7.105.010(10), (14). The trial court did not err.

13

prove that an exception applies under RAP 2.5(a), the appellant "must demonstrate actual prejudice through a 'plausible showing . . . that the asserted error had practical and identifiable consequences' in the proceeding below." *In re De Facto Parentage of A.H.*, 28 Wn. App. 2d 412, 421, 536 P.3d 719 (2023) (alteration in original) (internal quotation marks omitted) (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). An appellant waives an issue that they do not raise in their opening brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

*B. Application*

For the first time on appeal, the Livermores argue that posting signs and talking to neighbors is constitutionally protected speech. But they do not explain why we should consider this argument for the first time on appeal. The Livermores fail to demonstrate, or even argue, that this error is manifest. And they cite no authority that would support a conclusion that posting signs on or around the Grolleys' property or asking the Grolleys' neighbors about Keegan is constitutionally protected activity in this context. For these reasons, we decline to consider this argument.

III. ATTORNEY FEES BELOW

*A. Legal Principles*

If a trial court grants a protection order, RCW 7.105.310(j)[9] provides the court with broad discretion to grant reasonable attorney fees as it deems proper. We review a trial court's award or

---

[9] RCW 7.105.310 has been amended since the petitions for orders for protection were filed. Because this amendment does not affect our analysis, we cite to the current version. *See* LAWS OF 2025, ch. 122, § 2.

denial of attorney fees for abuse of discretion. *Morgan v. City of Federal Way*, 166 Wn.2d 747, 757-58, 213 P.3d 596 (2009).

*B. Application*

The Grolleys assert in their cross-appeal that the trial court erred by denying a fee award and " 'reserving' " the issue of fees for potential future violations because it "precluded the Grolleys from relief." Br. of Resp't at 59-60. However, the trial court has broad discretion to grant or deny attorney fees, and the Grolleys do not cite any authority that the trial court is precluded from "reserving" the issue of fees for a potential future violation. Where no authorities are cited in support of an argument, we are not required to consider the argument or search out authorities in support of the claim. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). We therefore conclude that the trial court did not abuse its discretion by denying a fee award.

The Grolleys also argue that the Livermores' appeal constitutes harassment in and of itself and that "the trial court's decision regarding the fees should be vacated and remanded for reconsideration" based on this assertion of continuing harassment. Br. of Resp't at 60. Final judgments are appealable as of right, RAP 2.2(a), and the Grolleys offer no authority to support their argument that exercising this right may constitute harassment. Thus, we refuse to vacate the trial court's fee decision.

ATTORNEY FEES AND SANCTIONS

The Grolleys request attorney fees on appeal pursuant to RAP 18.1 and RCW 7.105.310(1)(j). If attorney fees are available at the trial court, a party may recover fees on appeal. RAP 18.1. Under RCW 7.105.310(1)(j), the trial court may require the respondent to pay attorney

fees when granting a protection order. As the Grolleys could have recovered fees at the trial court as the prevailing party, we award them attorney fees on appeal in an amount to be determined by a commissioner of this court.

The Grolleys also argue that the Livermores' opening brief was frivolous and that its "indiscriminate use of unpublished decisions, assertion of irrelevant cases, and [ ] failure to assert any genuine legal basis for vacating the protection orders" entitle the Grolleys to fees on appeal and/or sanctions against the Livermores. Br. of Resp't at 54.

Under RAP 18.9(a), a party who files a frivolous appeal or disobeys this court's procedural rules may be required to pay fees to the other party or sanctions to this court. "[A]n appeal is frivolous if it raises no debatable issues on which reasonable minds might differ and it is so totally devoid of merit that no reasonable possibility of reversal exists." *Protect the Peninsula's Future v. City of Port Angeles*, 175 Wn. App. 201, 220, 304 P.3d 914 (2013). We consider the civil appellant's right to appeal an adverse judgment; thus, we resolve any doubts about whether an appeal is frivolous in favor of the appellant. *Id.* Under GR 14.1, unpublished opinions are nonbinding on the court of appeals, but a party may cite to an opinion filed on or after March 1, 2013, so long as they identify the source as a nonbinding authority.

Because we resolve any doubts regarding frivolity in favor of the appellant, we decline to hold that the Livermores' opening brief was frivolous. Reasonable minds may differ on whether the facts supported findings of unlawful harassment.

However, the Livermores cited unpublished opinions that were issued prior to March 1, 2013, in their opening brief *six separate times*. Br. of Appellant at 24, 28, 33, 38, 46, 53 (citing *Lau v. Villa*, noted at 133 Wn. App. 1022 (2006) and *Mettling v. Hutchison*, noted at 170 Wn. App.

1015 (2012)). They also cite *Hink v. Rude*[10] six times without identifying it as nonbinding, and *In re Marriage of Guo and Ren*[11] once. Br. of Appellant at 25, 27, 34, 36, 41, 50, and 56. The Livermores claim that the citations "clearly denote" that the cases are unpublished, Reply Br. at 15-16, but their assertion is false.[12] In total, the Livermores violated GR 14.1 *thirteen times* in their opening brief. This rather flagrant disregard of GR 14.1 warrants a monetary sanction. We therefore issue a sanction of $500 against the Livermores.

                                    CONCLUSION

We affirm the trial court because it did not abuse its discretion by issuing the protection orders against Glen and Autumn Livermore or by reserving the issue of fees for a potential future violation of the protection orders. We award attorney fees on appeal to the Grolleys and issue a sanction of $500 against the Livermores.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[10] No. 54003-7-II (Wash. Ct. App. May 18, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054003-7-II%20Unpublished%20Opinion.pdf.

[11] No. 81236-0-I (Wash. Ct. App. Apr. 19, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/812360.pdf.

[12] Presumably, the Livermores mean that the unpublished nature of these cases was "clearly denoted" because we could infer that they are unpublished from their citations. This effort is insufficient to comply with GR 14.1. In an unpublished opinion, this court imposed monetary sanctions against a party for violating GR 14.1 where the litigant cited the unpublished cases in the correct format but made no effort to identify the cases as nonbinding authority. *In re Parenting and Support of B.E.C.*, No. 60498-1-II, slip op. at 22 (Wash. Ct. App. Oct. 7, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2060498-1-II%20Unpublished%20Opinion.pdf. We are unconvinced that correct formatting alone demonstrates compliance with GR 14.1.

No. 59832-9-II (consol. w/Nos. 59839-6-II, 59842-6-II, 59849-3-II, 59852-3-II, and 59859-1)

_____
CRUSER, J.

We concur:

_____
MAXA, P.J.

_____
LEE, J.

18